1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    SCHRADER CELLARS, LLC,                   Case No.  21-cv-01431-SK

            Plaintiff,
8
                                             **ORDER REGARDING MOTIONS FOR**
9          v.                                **SUMMARY JUDGEMENT**

10   ROBERT M. ROACH,                         Regarding Docket Nos. 126, 127, 130, 132

            Defendant.
11

12          This matter comes before the Court upon consideration of the motion for partial summary

13   judgment by Plaintiff Schrader Cellars, LLC ("Cellars") and the motion for summary adjudication

14   by Defendant Robert M. Roach ("Roach").  Having carefully considered the parties' papers,

15   relevant legal authority, the record in the case, and having had the benefit of oral argument, the

16   Court hereby GRANTS Cellar's partial motion for summary adjudication on its claim for

17   declaratory relief and on Roach's counterclaims (3 through 6) and DENIES Roach's counter

18   motion for summary adjudication on the issues of statute of limitations and whether Roach

19   violated California Rule of Professional Responsibility Rule 3-300.  The Court RESERVES ruling

20   on Cellars' motion for summary judgment with regard to Roach's first and second counterclaims.

21          The Court GRANTS Cellar's motion to seal Exhibit I to the Declaration of Jason Smith.

22   (Dkt. No. 126.)  The Court GRANTS IN PART and DENIES IN PART Roach's motion to seal

23   documents designated as confidential by Cellars.  The Court GRANTS the motion as to: (1) the

24   second half of page CONSTELLATION 00000648 after the word "authenticity", (2) the bottom

25   portion of page CONSTELLATION 00000649 after the phrase "current waiting list to purchase",

26   (3) pages CONSTELLATION 00000651-654, 658 in Exhibit 27 and the number of the sale price

27   on pages 7 and 12 of Roach's motion and DENIES the motion as to the remainder.  (Dkt. No.

28   130.)  Roach shall publicly file corrected redacted versions of the Declaration of Jessica

United States District Court
Northern District of California

MacGregor and Roach's motion and shall publicly file a fully unredacted version of his opposition to Cellars motion by no later than January 3, 2023.

## BACKGROUND

This dispute arises out of a former friendship between Defendant Roach and Fred Schrader ("Fred").[1]  Before conflict arose in 2018, Roach and Fred were close friends for over two decades. (Dkt. No. 131-1 (Declaration of Robert M. Roach), ¶ 2.)  They met in the mid-1980s when Roach began visiting Napa Valley two to three times a year.  (Dkt. No. 128-3 (Declaration of Casey Low), Ex. C (Deposition of Fred Schrader) at 130:24-131:4.)  Roach is admitted to the bar in Texas but not in California.  He only has offices only in Texas.  (Dkt. No 131-1 (Roach Decl.), ¶ 3.)  Roach and Fred discussed that Roach lived in Texas frequently.  (*Id.*)

Starting in 1997, Roach began providing legal advice to Fred.  In the 1997-1998 timeframe, Roach provided legal advice to Fred personally in connection with Fred's divorce from his then-wife Ann Colgin.  (Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9); Dkt. No. 131-1 (Roach Decl.), ¶ 5.)  Fred cannot recall legal work Roach performed for him personally.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 49 (Fred Depo.) at 214: 12-18; 215:12-23.) Fred said that his former spouse, Carol Schrader ("Carol") "would be more aware" of legal work Roach performed.  (*Id.*)  Carol testified that Fred would know more about Roach's representation but mentioned a dispute over land ownership, date unknown, in California, and another dispute with a winemaker in California, again date unknown.  (Dkt. No. 130-4 (Unredacted MacGregor Decl.), Ex. 50 (Deposition of Carol Schrader) at 238:17-239: 22; 241:6-9.)

On July 29, 1998, Fred, as the sole manager, incorporated Cellars as a limited liability company ("LLC") in California.  (Dkt. No. 129-8 (Declaration of Jason Smith), Ex. H.)

### A.    Fred's Version of the Financial Relationship.

Fred states that, in 2001, Roach and Fred began talking about an arrangement in which

---

[1] Because there are two individuals with the last name "Schrader," the Court will refer to them by their first names.  All references to Schrader Cellars will be to "Cellars," also to avoid confusion.  Roach's nickname is "Randy," so some documents refer to him as "Randy Roach" instead of by his legal name "Robert Roach."

United States District Court
Northern District of California

Roach could become involved in the wine industry.  (Dkt. No. 128-4 (Low Decl.), Ex. D (Fred Depo.) at 69:16-21.)  The arrangement was for Roach to contribute money to buy grapes, via a loan which would be paid back with interest.  (Dkt. No. 128-3 (Low Decl.), Ex. C (Fred Depo.) at 32: 25-33:6, 27:8-11, 40:4-15.)  In exchange, Fred would name one of Cellars' wines "RBS," after Roach, winemaker Thomas Brown, and Fred.  (Dkt. No. 127 (Cellar's Mot.) at page 11.)  The understanding was that Fred would help his friend "have a little toehold in the industry" and "be recognized as being a player." (Dkt. No. 128-4 (Low Decl.), Ex. D (Fred Depo.) at 69:13-70:13.)

**B.      Roach's Version of the Financial Relationship.**

Roach asserts that, in late 2000/early 2001, Fred asked Roach to be the sole financial partner in a new venture to produce an elite Cabernet Sauvignon wine using certain grapes from a famous vineyard.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 51 (Roach Depo.) at 23:25-25:7.)  Roach agreed to invest up to $150,000 in the project over three years.  (Dkt. No. 131-1 (Roach Decl.), ¶¶ 8-9.)  He was the only individual to provide capital to the project.  (*Id.*)  Fred agreed to produce and market the wine.  (*Id.*)  As part of this deal, Roach was to receive a return of his initial investment plus six percent interest until fully repaid, his equal ownership percentage, fifteen cases of "library RBS wine" (later increased to seventeen cases) and the ability to place ten cases of RBS wine at Texas restaurants.  (*Id.*)  Roach also was to be paid back before any profit was realized.  (Dkt. No. 128-2 (Low Decl.), Ex. B (Roach Depo.) at 24: 17-27:22.)  Roach, Fred and Brown would share one-third of the profits after it became profitable.  (Dkt. No.132-1 (MacGregor Decl.), Ex. 51 (Roach Depo.) at 24:17-28:1.)  Roach agreed not to invest in another wine project and agreed that he would help promote RBS and the other wines of Cellars in Texas, California, and Europe.  (Dkt. No. 128-2 (Low Decl.), Ex. B (Roach Depo.) at 25:16-19.)

Roach claims that he and Fred agreed that RBS was a separate entity and was "owned separately from [ ] Cellars."  (Dkt. No. 131-1 (Roach Decl.), ¶ 11.)  Roach claims that he and Fred agreed that "for regulatory and administrative purposes, [ ] Cellars would make and sell the wine for our separate RBS business under a verbal license agreement."  (*Id.*)

Roach testified that the agreement changed several times.  (Dkt. No. 128-2 (Low Decl.), Ex. B (Roach Depo.) at 30:3-6.)  One way it was changed was that Roach would receive two extra

3

1   cases of wine instead of being paid back interest.  (*Id.* at 30:7-10; *see also* Dkt. No. 131-1 (Roach

2   Decl.), ¶ 19.)  That change occurred in December 2010, when Cellars sent Roach the "final

3   payment" of $50,000.  (Dkt. No. 128-1 (Low Decl.), Ex. A (Roach Depo.) at 103:9-104:12.)

4   Roach testified that the additional cases of wine were intended to compensate Roach for the

5   deficiency in the six percent interest payments on the $135,000.  (*Id.*)

6         The agreement also changed when Brown withdrew from the partnership, when the RBS

7   wine was placed under the Schrader label, and when it was determined that the profit would be put

8   back into RBS.  (Dkt. No. 128-2 (Low Decl.), Ex. B (Roach Depo.) at 30:11-20.)

9   **C.     Brown's Description of Financial Relationship.**

10        The parties agree that Brown agreed to make the wine.  (Dkt. No. 127 (Cellar's Mot.) at

11  page 11; Dkt. No. 131 (Roach Opp.) at 8; Dkt. No. 131-1 (Roach Decl.), ¶ 8.)  Brown

12  testified that he did not know that a partnership with him existed and that he did not agree to be a

13  member of RBS LLC.  (Dkt. No. 128-8 (Low Decl.), Ex. K (Deposition of Thomas Brown) at 61:

14  6-21.)

15  **D.     Undisputed Facts regarding Financial Relationship.**

16        The wine was to be separate from Cellars.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 55

17  (Deposition of Carole Boehk) at 62:5-64:22; Dkt. No. 128-17 (Low Decl.), Ex. Q (email from

18  Boehk).)  The agreement between Fred and Roach was not written.  (Dkt. No. 128-2 (Low Decl.),

19  Ex. B (Roach Depo.) at 48:13-49:4; Dkt. No. 128-1 (Low Decl.), Ex. A (Roach Depo.) at 129:2-

20  130:11.)  The agreement was based on a handshake, which was how Fred usually operated and

21  what he required.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 51 (Roach Depo.) at 24:17-30:2, Ex.

22  55 (Boehk Depo.) at 106:15-25.)

23  **E.     Roach's Legal Representation.**

24        Roach testified that he had a preexisting legal relationship with Fred when they entered

25  into the deal.

26              So there was -- and now, you know, subsequent to that, he approaches
              me about doing this partnership.· We already had a preexisting
27              relationship that was both legal and business.· The overwhelming
              majority, though, of the relationship was -- was wine -- wine business;
28              and the legal part of it would come, you know, in -- in fits and spurts.·

1

> Maybe it would, maybe it wasn't.· I wasn't functioning like his -- like his general counsel, but he held me out to people for sure."

2

(Dkt. No. 165-2 (Roach Depo.), Ex. C. at 141:2-10.)

3

Roach agreed to perform legal work when necessary as part of the deal.  (Dkt. No. 132-1

4

(MacGregor Decl.), Ex. 51 (Roach Depo) at 25:25-27:11.)  Roach testified that, as part of the

5

agreement:

6

> I would continue to do the same kind of legal help that I had done in the past and that was giving, you know, advice, giving my thoughts about legal work, you know whenever I was called upon, to the extent that I felt comfortable doing it with the agreement that I could limit it as I wanted to with the – line being, you know, the – the work is worth what you're paying for – for it, which is zero.  It was all going to be uncompensated legal work. . . . [Fred] understood that it wasn't going to be representing him in California.

7

8

9

10

(*Id*. at 25:25-26:15.)  Roach further testified that the agreement was that his legal work would not

11

encompass business deals, but instead:

12

13

> I can talk about dispute resolution, that's one of my areas of expertise.  I can talk about jurisprudential principles generally because I teach that and – and practice that, and – and strategy for how to resolve cases, kind of one of my specialties.

14

15

(*Id*. at 26:18-23.)

16

Roach also testified that he represented RBS LLC:

17

18

> Q. Would you agree or disagree with whether or not you – you had agreed to provide legal services and counseling to Roach Brown Schrader, LLC?

19

20

> A. I had. No. That's true.

21

> Q. Would legal services not include such things as entering into agreements with other parties?

22

23

> A. It might. It didn't require that. That wasn't the agreement. Again, it would be if Fred asked and if I thought there was something I could do within limits, you know, that I would decide with respect to any particular task.

24

25

26

> Q. Would you agree with the statement that from the inception of Roach Brown Schrader, LLC through mid-2016, you provided substantial and valuable legal services and gave business advice to [ ] Cellars and Roach Brown Schrader, LLC?

27

28

A. I would parse that. I mean, generally speaking, that's true. But it -- it should be -- if you're going to be really accurate about it, it should be parsed. I mean, in fact, you know, it's limited in the way I have previously described. And in practice it was limited to essentially one representation in court. The rest of it was, you know, advice, counseling that was as much prob- -- frequently as much business advice as it was legal advice because it was resolving disputes between businesses. So . . .

Q. Those occurred since the inception of Roach Brown Schrader, LLC and through mid-2016, though. Correct?

A. I'm sorry. I didn't understand the question.

Q. The legal advice you speak of occurred since the inception of Roach Brown Schrader, LLC through mid-2016?

A. Well, it occurred before that too. And it occurred, you know, outside of that as well.

Q. Well –

A. I helped –

Q. Go ahead.

A. I helped Fred before RBS, LLC was created. I helped Fred on things that didn't have anything to do with RBS, RBS, LLC or [ ] Cellars. Same thing, I decided. He had to ask for help. I had to decide what I could and could not do. And then – then I would undertake what I thought was appropriate and not undertake what I thought was inappropriate.

(Dkt. No. 165-2 (Low Decl.), Ex. D (Roach Depo.) at 119:2-121:3.) Roach also testified:

A. Well, what I would – that's not what I'm saying here. Okay? What I'm saying is that I provided discrete and legal services regarding trademark infringement, and a logging suit that are akin to an outside general counsel responsibilities. They're akin to being an outside general counsel, but obviously it is not an all-purpose outside general counsel responsibilities.

Q. What was the logging suit?

A. That is Ridgetop in Sonoma. And what I did there was limited to getting a request from Fred [ ] on behalf of Ridgetop looking for the best appellate lawyer in California to appeal a very difficult adverse set of orders in Sonoma County. And I researched, you know, the appellate bar, which I'm a member of on a national level and

discovered that Paul Fogel was the guy, and I recommended Paul to Fred, and they – and they hired him, but that was the end of my involvement in those suits.  So I wouldn't call that being – providing general counsel services, but, you know, being called upon for that -- you know, finding the right appellate lawyer for this particular situation I do consider to be akin to an outside general counsel's role.

(Dkt. No. 137-1 (Low Decl.), Ex. B (Roach Depo.) at 125:1-25.)

Roach also testified that he specifically represented Cellars as part of the agreement:

Q. Did you ever represent, I mean, [ ] Cellars as an attorney?

A. Yes.

Q. Did you ever have an engagement agreement with that entity?

A. No. Other than oral. Again, written, no.  Apart from what we've already described.

Q. Okay.

A. I thought all that was pursuant to the LLC oral agreement.

(Dkt. No. 137-1 (Low Decl.), Ex. A (Roach Depo.) at 9:6-15.)

In addition, Roach represented in an email to a third party on November 2, 2004: "Subsequent to forming the RBS partnership, I have served as the outside general counsel to [ ] Cellars . . . . This wine related legal work takes me to Bordeaux a couple of times a year and to Napa 6 to 8 times a year."  (Dkt. No. 137-1 (Low Decl.), Ex. R.)  Roach testified that his description in this email was accurate.  (Dkt. No. 165-2 (Low Decl.), Ex. D at 175:19-178:24.)

Roach made clear in his Counterclaim that he provided legal work for RBS, Fred, and Cellars as part of the deal.  (Dkt. No. 54 (Counterclaim), ¶ 15 ("For nearly two decades, [ ] Cellars and Fred [ ] also requested and procured free marketing work, legal work, business services, and business advice from Roach and his Texas law firm by representing to Roach that he had an equity ownership interest in RBS."), ¶ 27).)  He echoed that statement in the Texas litigation:  "Roach continued to fulfill his partnership obligations and to work on behalf of Roach Brown Schrader, LLC.  He regularly gave business and legal advice to Schrader and [ ] Cellars" and "[j]ust as he had done for RBS, he served as one of [another entity's] lawyers[.]"  (Dkt. No. 132-1 (MacGregor

7

Decl.), Ex. 31 (First Amended Petition) at ¶¶ 14, 27, Ex. 34 (Second Amended Petition) at ¶¶ 14, 27), Ex. 35 (Third Amended Petition) at ¶¶ 14, 27.)  The allegations of the Fourth Amended Petition and Fifth Amended Petition are similar to the earlier petitions, but they add that Roach agreed to provide legal representation from Texas.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 38 (Third Amended Petition) at ¶¶ 12, 14.)  The Fifth Amended Petition states:

> from RBS' inception and through mid-2016, Roach provided substantial and valuable legal services in Texas from his firm of Texas lawyers and gave substantial business advice to Schrader about RBS, [ ] Cellars, Boars' View, and a variety of other Schrader projects. Moreover, and in accordance with his obligations under the agreement and business partnership with Schrader, Roach's law firm of Texas lawyers provided additional valuable legal services in Texas to [Fred] and [ ] Cellars, at no cost to Schrader, directly and also indirectly related to RBS.

(Dkt. No. 128-14 (Low Decl.), Ex. N (Fifth Amended Petition) at ¶ 14.)

In contrast, Roach claims in his declaration:  "I performed the limited legal work at issue in this case in Texas."  (Dkt. No. 131-1 (Roach Decl.), ¶ 3.)

There was no written fee agreement between Cellars and Roach, and there was no monetary fee paid by Cellars to Roach.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 48 (Deposition of Jason Smith) at 248:20-249:5, 249:7-14.)  Fred characterizes the payment for legal services as part of the overall deal.  (Dkt. No. 137 (Cellar's Opp.) at page 11.)  The value of the 180 bottles of wine (15 cases of 12 bottles)[2] per year was substantial.  (Dkt. No. 137-1 (Low Decl.), ¶ 7.)[3]

**F.     Payments by Roach in 2001 and 2002.**

On October 31, 2001, Roach paid $60,000, which was labeled by Cellars as "Investment – Roach" and "Investment Roach/Brown/Schrader."  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 4.)

On October 4, 2002, Roach sent a letter enclosing a "capital contribution" of "$37,500 on behalf of the RBS L.L.C. to pay for vinification expenses of the 2002 vintage of Schrader RBS cab," and the letter enclosed a check for $37,500 made out to Cellars.  (Dkt. No. 128-22 (Low

---

[2] There are 12 bottles in a case.  (Dkt. No. 132-1 (MacGregor Decl.) Ex. 25).)

[3] By 2017, Cellars sold a bottle at a retail price of $225.  (Dkt. No. 130-4 (Unredacted MacGregor Decl.), Ex. 27 at page CONSTELLATION 00000632 and 00000642.)  The cost of wine at earlier times was $125 – 150 per bottle.  (Dkt. No. 165-2 (Low Decl.), Ex. D (Roach Depo.) at 36: 11-19.)

United States District Court
Northern District of California

Decl.), Ex. V.)  On October 7, 2002, Cellars' records indicated a payment of $37,500 for "Investment Roach/Brown/Schrader."  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 7.)

**G.      Formation of Roach Brown Schrader LLC.**

In September 2002, Roach engaged the law firm Farella Braun & Martel, LLP ("Farella") to advise Roach in forming Roach Brown Schrader LLC ("RBS LLC").  (Dkt. No. 128-2 (Low Decl.), Ex. B. (Roach Depo.) at 56:22-57:4; Dkt. No. 128-30 (Low Decl.), Ex. DD.)  Roach claims that he engaged Farella on behalf of RBS LLC, but Cellars argues that he did so individually. (*Compare* Dkt. No. 128 *with* Dkt. No. 132.)[4]  The initial idea was that RBS LLC would have three members:  Fred, Roach and Brown.  (Dkt. No. 128-31 (Low Decl.), Ex. EE.)  Roach characterizes this formation of RBC LLS as "confirm[ing] their handshake partnership agreement through the creation of a separate LLC."  (Dkt. No. 132 at page 9.)

Farella prepared a draft operating agreement for RBS LLC in or around December 2002 (the "Operating Agreement").  (Dkt. No. 128-2 (Low Decl.), Ex B. (Roach Depo.) at 81:4-85:16.) Before any Operating Agreement was finalized, Roach directed the Farella law firm to file Articles of Organization with the California Secretary of State for RBS LLC.  The Articles of Organization were filed on December 31, 2002.  (Dkt. No. 128-24 (Low Decl.), Ex. X.)  Roach claims that Fred agreed to form RBS LLC.  (Dkt. No. 131-1 (Roach Decl.), ¶ 20.)  But there is no dispute that Fred rejected the draft Operating Agreement (Dkt. No. 128-2 (Low Decl.), Ex. B. (Roach Depo.) at 226:18-229:4; 128-1 (Low Decl.), Ex. A. (Roach Depo.) at 9:2-5; 66:23-69:24) and that the Operating Agreement was never signed.  (Dkt. No. 128-6 (Low Decl.), Ex. F.)

On April 1, 2003, even though Fred had refused to sign the Operating Agreement, Roach signed and filed a handwritten Statement of Officers and Directors for RBS LLC (listing only Roach and Fred) with the California Secretary of State, which identifies Roach and Fred as "managers" and describes the business purpose as "wine production and sales."  (Dkt. No. 128-26 (Low Decl.), Ex. Z.)  Only Roach signed this Statement of Officers and Directors for RBS LLC; Fred did not sign it.  (*Id.*)  Roach testified he believed that this filing "formalized" the terms of the

---

[4] The briefs both make this argument without citation to evidence.

1    earlier oral partnership agreement.  (Dkt. No. 128-2 (Low Decl.), Ex. B (Roach Depo.) at 48:13-

2    49:21, 90:17-19); Dkt. No. 128-1 (Low Decl.), Ex. A. (Roach Depo.) at 21:11-12, 25:2-8.)  Fred

3    testified he had not seen the Articles of Organization or Statement of Officers and Directors filed

4    at Roach's direction, and he did not know if he was considered a "member" of RBS LLC.  (Dkt.

5    No. 128-3 (Low Decl.), Ex. C. (Fred Depo.) at 54:24-55:3.)

6          By this time, Roach claims that, because Brown was no longer involved in the partnership,

7    Roach and Fred owned 50 percent each of RBS LLC.  (Dkt. No. 131-1 (Roach Decl.), ¶ 8.)

8    Before Roach filed Statement of Officers and Directors for RBS LLC, Fred had told him that

9    Brown had dropped out.  (Dkt. No. 165-2, Ex. C (Roach Depo.) at 58:2-16; 59: 3-15, Ex. D

10   (Roach Depo.) at 39:18-41:3.)

11         Roach testified that his understanding was that the Operating Agreement was

12   "coterminous" – which meant that the "LLC confirms the partnership agreement."  (Dkt. No. 128-

13   1 (Low Decl.), Ex. A (Roach Depo.) at 21:8-12.)  Roach also said that the LLC agreement was

14   made to memorialize the partnership agreement:  "It's certainly the ownership part of it" (Dkt. No.

15   128-1 (Low Decl.), Ex. A (Roach Depo.) at 25:2-4) and that "RBS, LLC was designed to provide

16   official, concrete proof of our partnership agreement.  Period, full stop."  (Dkt. No. -(Low Decl.),

17   Ex. B (Roach Depo.) at 90: 17-19).  Roach also testified:

18              The partnership agreement spelled out things that aren't, I think, in
            the LLC agreement.  Some are contained in the LLC agreement, and
19          some are contained in the operating agreement that wasn't signed.
            There are certainly provisions in the operating agreement that are
20          not part of our partnership agreement.

21

22   (Dkt. No. 128-1 (Low Decl.), Ex. A (Roach Depo.) at 21:23-22:3.)  When asked what those

23   "things" are, Roach responded that he, Fred, and Brown would own one-third of RBS and that

24   there was a maximum investment of $150,000 over three years that would be paid back out of

25   profits with six percent interest, and that would also include 15 cases of RBS "library" wine for

26   each.  (Dkt. No. 128-1 (Low Decl.), Ex.  A (Roach Depo.) at 22:6-23:12.)  In addition, Fred would

27   make the wine, and Roach would engage in "Texas marketing" and "legal work."  (Dkt. No. 128-1

28   (Low Decl.), Ex. A (Roach Depo.) at 22:6-23:12.)  Roach also claims that the RBC LLC was not

United States District Court
Northern District of California

1  intended to change the partnership agreement.  (Dkt. No. 131-1 (Roach Decl.), ¶ 21.)

2  **H.    Roach's Representation of Cellars in 2003.**

3       In January 2003, Roach applied to practice *pro hac vice* in this Court as counsel of record

4  for Cellars in litigation against Mondavi (the "Mondavi litigation"), and in July 2003, that

5  application was granted.  (Dkt. No. 128-20 (Low Decl.), Ex. T.)  Fred testified that, even though

6  counsel of record also included another firm, Roach, "representing [ ] Cellars," was present at the

7  mediation of the case.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 49 (Fred Depo.) at 219:12-15.)

8  That mediation took place in San Francisco, California.  (Dkt. No. 164-1 (Supplemental

9  Declaration of Fred Schrader), ¶ 2; Dkt. No. 163 (Roach Response) at page 2.)  The case was

10  dismissed two weeks after Roach's admission.  (Dkt. No. 128-20 (Low Decl.), Ex. T.)  "[I]n the

11  same time-frame" as that litigation, Roach stated that he "represented Fred" but the "work was for

12  [ ] Cellars" when he "negotiat[ed] an indemnity agreement with Andy Beckstoffer concerning" the

13  Mondavi litigation.  (Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9).)

14  Also in 2003, Roach provided legal advice to Fred in litigation brought against him "by Margaux

15  Singleton at the end of their relationship."  (*Id.*)

16  **I.    Additional Payment by Roach in 2003.**

17       On April 4, 2003, Roach contributed another $37,500, which Cellars characterized as

18  "Investment Roach/Brown/Schrader" and "Randy Roach – 2002 Project Contribution."  (Dkt. No.

19  132-1 (MacGregor Decl.), Ex. 12.)

20  **J.    Fred's Description of Roach in 2003.**

21       In 2003, Cellars designed a "RBS Schrader Cellars" business card for Roach's use.  (Dkt.

22  No. 130-4 (Unredacted MacGregor Decl.), Ex. 50 (Carol Depo.) at 160:19-161:4; Dkt. No. 132-1

23  (MacGregor Decl.), Ex. 55 (Boehk Depo.) at 65:4-66:4.)  The business card bears the designation

24  "Vintner," which non-party Constellation Brands, Inc. ("Constellation") confirmed "[t]ypically"

25  means "owner."  (*Id.*, Ex. 9, Ex. 36 (Deposition of Denis Rozin) at 109:6-13.)  In 2003, Cellars

26  published a wine offering to its customers identifying Roach as the "R" of RBS and included an

27  article by "renown [sic] wine expert Katsuyuki Tanaka that stated:  "RBS is made from Clone

28  #337, with Randy Roach who is a lawyer in Texas, a university professor, and a grape grower.

United States District Court
Northern District of California

RBS actually stands for the names of the three partners: 'Roach, Brown, Schrader.'"  (Dkt. No. 130-4 (Unredacted MacGregor Decl.), Ex. 10.)

**K.     Roach's Legal Representation of Fred and Cellars in 2003/2004**

In late 2003/early 2004, Roach defended Fred's deposition in a case called *Bryant v. Turley* and "provided some strategic advice to Helen Turley in the same time frame." (Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9);164-2 (Supplemental Declaration of Casey Low).)  That litigation took place in Napa County, California, and the deposition took place in California.  (Dkt. No. 164-1 (Supplemental Fred Decl.), ¶ 4; Dkt. No. 164-2 (Suppl. Low Decl.), Ex. B-22; Dkt. No. 163 (Roach Response) at page 2.)

Roach also assisted Cellars in obtaining a liquor license in Texas.  (Dkt. No. 128-16 (Low Decl.), Ex. P.)

**L.     Application to Trade Association in 2004.**

In March 2004, Roach submitted an application to a local trade association in which Roach stated that he owned a winery called "RBS."  (Dkt. No. 128-12 (Low Decl.), Ex. L).  On April 1, 2004, that trade association rejected Roach's application and informed Roach that RBS did not qualify as a "separate and distinct brand" from Cellars.  (Dkt. No. 128-18 (Low Decl.), Ex. R).

**M.     2005 Payment by Cellars to Roach.**

On December 1, 2005, Cellars paid Roach the amount of $100,000.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 15.)  The check was made payable to "Randy Roach Investor."  (*Id*.)

**N.     Roach's Legal Representation of Fred in 2005 and 2006.**

In 2005/2006, Roach represented Fred in locating appellate counsel in California for litigation related to another partnership.  (Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9).)

**O.     Roach's Divorce and Characterization of RBS.**

In his 2006 divorce proceedings, Roach assigned a zero value to his alleged ownership of Schrader RBS.  (Dkt. No. 128-1 (Low Decl.), Ex. A (Roach Depo.) at 108:19-23.)  He also told his then-wife: "Fred's out of the picture.  RBS may be dead as far as I know."  (Dkt. No. 128-29 (Low Decl.), Ex. CC.)

United States District Court
Northern District of California

**P.      Additional Legal Work by Roach from 2009-2012.**

In response to an inquiry by the Internal Revenue Service regarding Roach's documentation for his expense deductions for RBS in 2008, Roach stated in an email to his accountant that Roach listed himself as outside general counsel regarding legal issues, trademark infringement actions, and suits to stop logging on vineyard property owned by Cellars.  (Dkt. No. 165-2 (Low Decl.), Ex. D (Roach Depo.) at 123:16-124:23.)

In 2009, Roach represented Cellars in a trademark dispute with Schrader Vineyards.  (Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9).)  That case was filed in this Court as Case No. 5:09-cv-00645-JF.

**Q.      2010 Payment by Cellars to Roach.**

On December 13, 2010, Cellars sent Roach a $50,000 payment, which is marked in Cellars' financial records as "final payment loan."  (Dkt. No. 128-25 (Low Decl.), Ex. AA.) Roach received the final payment but cannot locate a copy of the check.  (Dkt. No. 128-2 (Low Decl.), Ex. B. (Roach Depo.) at 35:4-19.)  Roach testified that he recalls a conversation at the time in which Fred told Roach: "I don't want to have to spend any more money and write you any more checks on this," and Roach agreed to accept the total amount of $150,000 plus additional wine as payment.  (Dkt. No. 128-1 (Low Decl.), Ex. A. (Roach Depo.) at 103:9-104:16.)

**R.      Roach's Legal Representation in 2010.**

In 2010, Roach "assisted Fred in the dissolution of Bob Coakley's ownership in Boar's View" and "assisted Boar's View in connection with the dissolution of a partnership interest in that entity." (Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9).)

In 2012, Roach "assisted Fred in a dispute over a large purchase of Schrader wine by a major collector," and this work was performed for Fred.  (*Id.*)

At some point in time not identified, Roach "assisted Fred" in the formation of a cigar business in the Dominican Republic.  (*Id.*)

**S.      Fred's Description of Roach in 2012 and 2013.**

Fred described Roach as his "wine partner."  (Dkt. No. 132-1 (MacGregor Decl.), Exs. 20, 21.)  Fred also described Roach as a "vintner."  (*Id.*, Ex. 23.)

**T.     Activities of RBS LLC between 2003 and 2013.**

After its formation in 2003, RBS LLC held no votes, conducted no business, generated no income, and filed no tax returns.  (Dkt. No. 128-1 (Low Decl.), Ex. A. (Roach Depo.) at 26:6-9, 29:11-13, 160:24-161:6, 203:17-21.)  Cellars was the only entity that ever recognized any income, revenue, or profits related to Schrader RBS on its tax returns.  (Dkt. No. 128-21 (Low Decl.), Ex. U (Response to Requests for Admission); Dkt. Nos. 129-17 and 129-18 (Smith Decl.), Exs. Q, R.)

Roach never received or filed any K-1 tax forms related to RBS LLC (Dkt. No. 128-21 (Low Decl.), Ex. U (Response to Requests for Admission), even though his accountant advised him in 2004 that he was required to report Schrader RBS income and expenses on his taxes if he held an ownership interest in it.  (Dkt. No. 128-33 (Low Decl.), Ex. GG.)

**U.     Dissolution of RBS LLC in 2013.**

In November 2013, the California Franchise Tax Board sent Fred a Final Notice Before Suspension or Forfeiture because RBS LLC had failed to file any tax returns.  (Dkt. No. 128-13 (Low Decl.), Ex. M.)  On December 6, 2013, Fred emailed Roach and Brown and informed them that he was planning to file attached papers to dissolve RBS LLC as it "se[rve]s no purpose now." (Dkt. No. 128-15 (Low Decl.), Ex. O.)  Attached to the email were dissolution forms and a cover letter to the California Secretary of State.  *Id.*  Roach received Fred's email, but he intentionally did not respond.  (Dkt. No. 128-1 (Low Decl.), Ex. A (Roach Depo.) at 155:25-156:21.)  Roach also received a voicemail from the attorney who drafted the dissolution notice, but he intentionally did not respond to that either.  (*Id.* at 156:4-21.)  Roach testified that he believed Fred would not file the dissolution if he did not respond.  (*Id.* at 154:10-155:6, 155:25-156:3.)

On December 19, 2013, Fred filed the Certificate of Cancellation of RBS LLC with the Secretary of State, and that Certificate has been posted publicly available since the filing.  (Dkt. No. 128-19 (Low Decl.), Ex. S.)  Roach believed, based on the legal advice in the email that Fred had sent, that Fred could file the Certificate only if there was unanimous consent (of both Fred and Roach).  (Dkt. No. 131-1 (Roach Decl.), ¶ 22.)  The December 6, 2013, email was the only communication between Fred and Roach on the subject of the dissolution of RBS LLC.  (*Id.*, ¶ 23.)  After the email, the relationship between Fred and Roach did not change, and Fred continued

to tell Roach that he was his partner and co-owner of RBS.  (*Id.*, ¶ 22.)  Roach did not learn of the filing of the Certificate until after the sale of Cellars in 2017, described more fully below.  (*Id.*, ¶ 23.)

**V.     Actions in 2016:  Fred's Description of Roach in 2016, Roach's Legal Work for Carol Schrader in 2016 and End of His Legal Representation**

In 2016, at an event in Florida, Fred described Roach as his partner and "referred to RBS as [Roach's] wine."  (*Id.*, ¶ 53.)   Also in 2016, Roach provided legal work for Carol, at Fred's request, "in connection with a lawsuit with the Episcopal Diocese of Los Angeles."  (Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9).)  This legal representation was for Carol individually.  (*Id.*)   Also in 2016, Roach provided legal advice to Fred regarding the dissolution of Boar's View.  (*Id.*)   The parties agree that Roach's representation ended in 2016.  (Dkt. No. 128-3 (Low Decl.), Ex. C (Fred Depo.) at 117:3-118:19; Dkt. No. 132-1 (MacGregor Decl.), Ex. 48 (Smith Depo.) at 259:21-261:20 and Ex. 49 (Fred Depo.) at 229:22-230:17.)

**W.     Sale of Schrader RBS Wine.**

Cellars produced wines bottled under its own label and under the label "Schrader RBS."  (Dkt. No. 128-2 (Low Decl.), Ex. B (Roach Depo.) at 36:3-5.)  Cellars produced, marketed, and sold the Schrader RBS wine under the "Schrader" label.  (*Id.* at 30:14-31:25; Dkt. No. 54 (Roach's Answer and Counterclaims), ¶11.)  Cellars held the contract to purchase the grapes used to make the wines, including Schrader RBS, submitted all licenses and registrations related to Schrader RBS to federal and state governments, and registered, defended, and used the Schrader RBS mark in commerce.  (Dkt. Nos. 129-4, 129-5, 129-13, 129-14, 129-15, 129-16 (Smith Decl.), Exs. D, E, M, N, O, P.)

The original labels for wine were labeled as "Roach Brown Schrader" and later as "RBS."  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 2.)  The name was later shortened to "RBS".  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 5.)

**X.     Sale of Cellars to Franciscan Vineyards/Constellation.**

On June 16, 2017, Franciscan Vineyards, which at that time was a subsidiary of Constellation, acquired Cellars.  (Dkt. No. 129 (Smith Decl.), Ex. I.)  Constellation became the

United States District Court
Northern District of California

parent company of Cellars.  (Dkt. No. 137-2 (Smith Decl.), ¶ 1.)  On June 17, 2017, Roach first learned of the sale of Cellars to Constellation.  (Dkt. No. 131-1 (Roach Decl.), ¶ 24.)  Roach initially believed that the sale of Cellars to Constellation did not include RBS because Fred had always assured Roach that RBS was separate from Cellars.  (*Id.*)

**Y.     Texas Litigation.**

On September 4, 2018, Roach filed suit against only Fred in Texas state court (the "Texas litigation").  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 30.)  On April 22, 2019, Roach added Constellation as a defendant and added allegations that Fred had commingled assets of RBS with Cellars.  (*Id.*, Ex. 31.)  In that pleading, Roach asserted that Constellation holds his shares of RBS's assets in constructive trust and also pleaded conversion.  (*Id.*)  Roach also alleged that Fred had used some of the money from RBS for his personal use.  (*Id.*)  On August 8, 2019, Roach filed the Second Amended Petition.  (*Id.*, Ex. 34.)  On August 14, 2019, Roach filed the Third amended Petition.  (*Id.*, Ex. 35.)  On November 6, 2020, Constellation moved to abate the Texas Litigation and asserted that Cellars was an indispensable party.  (Dkt. No. 137-1 (Low Decl.), Ex. O.)  On November 12, 2020, Roach responded and stated:  "[ ] Cellars will not be prejudiced by being absent from this case."  (Dkt. No. 137-1 (Low Decl.), Ex. P at page 3.)  In that same statement, Roach represented that he "hereby disavows any intent to acquire any ownership interest in [ ] Cellars."  (Dkt. No. 137-1 (Low Decl.), Ex. P at page 2.)  On November 24, 2020, the Texas court denied Constellation's motion to add Cellars and held that Cellars was "neither a necessary nor indispensable party."  (Dkt. No. 137-1 (Low Decl.), Ex. Q.)

On January 11, 2021, Roach then filed a Fifth Amended Petition (his final petition) in the Texas litigation, in which he sought dissolution of the sale of Cellars.  (Dkt. No. 128-14 (Low Decl.), Ex. N.)  The request for dissolution in the Fifth Amended Petition was the first time Roach made that request.  (*Compare* Dkt. No. 128-14 (Low Decl.), Ex. N *with* Dkt. No. 132-1 (MacGregor Decl.), Exs. 30, 31, 34, 35 and 38.)

**Z.     Cellars' Filing of this Suit and Counterclaims.**

On February 26, 2021, Cellars originally filed this suit for declaratory relief, false advertising, trademark infringement under common law, federal trademark dilution, trade

libel/defamation, unjust enrichment, breach of fiduciary duty, and violation of Cal. Bus. & Prof.

Code § 17200 *et seq.* (Dkt. No. 1.) Cellars seeks a judicial declaration that:

> a. There were no liens or encumbrances on any of Schrader Cellars, LLC's physical assets or intellectual property when Schrader Cellars, LLC became a wholly-owned subsidiary of Franciscan Vineyards (n/k/a) TPWC, Inc.;
> b. All right, title, and interest to the claimed assets are the sole property of Plaintiff Schrader Cellars, LLC, including all physical assets, inventory, and intellectual property associated with Schrader Cellars and the SCHRADER marks;
> c. Roach has no rights or title to Plaintiff's assets;
> d. Roach has no registered or common law rights to any SCHRADER mark, including the Schrader RBS mark; and
> e. Roach has zero percent membership interest in Schrader Cellars, LLC.

(Dkt. No. 1.) Cellars also explained its theory of breach of fiduciary duty against Roach. (*Id.*, ¶¶ 134-138.) Cellars said that, because it had retained Roach as an attorney, there was a confidential relationship between them, and Roach owed Cellars a fiduciary duty even after the attorney-client relationship was terminated in July 2016. (*Id.*, ¶ 135.) Cellars alleged that "Roach abused the trust and confidence of" Cellars "by attempting to acquire an ownership, possessory, and/or pecuniary interest in" Cellars, without notifying Cellars "of his intent to do so, giving Plaintiff the opportunity to seek the advice of independent counsel, or obtaining Plaintiff's written consent." (*Id.*, ¶ 136.) Cellars filed an amended Complaint, and the allegations of the amended Complaint regarding breach of fiduciary duty were identical. (Dkt. No. 32 (Am. Compl.), ¶¶ 94-99.) After a motion to dismiss and after Cellars withdrew two claims here, the sole remaining claims are the claims for declaratory relief, unjust enrichment, and breach of fiduciary duty by Cellars against Roach.

Roach filed an Answer and Counterclaim. (Dkt. No. 28.) Roach alleged claims for (1) cancellation of the trademark "RBS" due to fraud on the United States Patent and Trademark Office ("U.S. PTO"), (2) cancellation of other trademarks, (3) declaratory judgment that Cellars currently holds RBS assets in trust for Roach because Cellars took over the assets of RBS in a wrongful manner, (4) declaratory judgment that Cellars is equitably estopped from denying Roach's ownership interest in the RBS assets because its actions caused Roach to believe that

1    Cellars recognized his ownership; (5) declaratory judgment that Cellars is equitably estopped from

2    denying Roach's equitable ownership in Cellars; and (6) equitable accounting.  (*Id.*)  The theory

3    behind the first two claims for cancellation of the trademarks is that Cellars obtained those

4    trademarks by fraudulent representations to the U.S. PTO because Cellars knowingly and

5    fraudulently declared under oath in their trademark applications that Cellars was the owner of the

6    trademarks, that it was entitled to exclusive use, and that no other person or entity had the right to

7    use the trademarks in commerce.  (*Id.*, ¶¶ 24, 28.)  Roach alleged that he had an equitable

8    ownership of the trademarks because Cellars fraudulently diverted the funds that he invested in

9    RBS.  (*Id.*, ¶¶ 35, 37.)

10                                          **ANALYSIS**

11        Cellars moves for partial summary judgment on its first claim for declaratory relief.

12   Cellars also moves for summary judgment as to all of Roach's claims against it.  (Dkt. No. 127.)

13   Roach moves for "summary adjudication" on Cellars' claim for breach of fiduciary duty "included

14   in Count I" – the claim for declaratory relief, the sixth claim for breach of fiduciary duty, Cellars'

15   seventh affirmative defense of unclean hands, and Cellars' third and fourth claims for trademark

16   infringement under the federal and California common law.  (Dkt. No. 132.)  Cellars voluntarily

17   dismissed the third and fourth claims for federal and common law trademark infringement.  (Dkt.

18   No. 137 at page 28.)

19   **A.      Applicable Legal Standard on Motion for Summary Judgment.**

20        A principal purpose of the summary judgment procedure is to identify and dispose of

21   factually unsupported claims.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).  Summary

22   judgment is proper "if the movant shows that there is no genuine dispute as to any material fact

23   and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In considering

24   a motion for summary judgment, the court may not weigh the evidence or make credibility

25   determinations, and is required to draw all inferences in a light most favorable to the non-moving

26   party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

27        The party moving for summary judgment bears the initial burden of identifying those

28   portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue

United States District Court
Northern District of California

18

1   of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is "genuine" only if there is sufficient

2   evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby,*

3   *Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case.

4   *Id.* at 248. If the party moving for summary judgment does not have the ultimate burden of

5   persuasion at trial, that party must produce evidence which either negates an essential element of

6   the non-moving party's claims or that party must show that the non-moving party does not have

7   enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan*

8   *Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

9       Once the moving party meets his or her initial burden, the non-moving party must go

10   beyond the pleadings and, by its own evidence, set forth specific facts showing that there is a

11   genuine issue for trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir.

12   2000). In order to make this showing, the non-moving party must "identify with reasonable

13   particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275,

14   1279 (9th Cir. 1996). In addition, the party seeking to establish a genuine issue of material fact

15   must take care to adequately point a court to the evidence precluding summary judgment because

16   a court is "not required to comb the record to find some reason to deny a motion for summary

17   judgment." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)

18   (citation omitted). If the non-moving party fails to point to evidence precluding summary

19   judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

20   **B.    Dueling Claims for Declaratory Relief.**

21       Cellars and Roach each assert claims for declaratory relief based on the same disputed

22   issue: whether Roach loaned money for RBS or whether Roach entered into a partnership with

23   Fred for RBS. If Cellars is correct, then it prevails on its motion for partial summary judgment on

24   its first claim for declaratory relief and also on its motion against Roach's claims for declaratory

25   relief. If Roach is correct, then Cellars' claim for declaratory relief, to the extent based on breach

26   of fiduciary duty, is defeated. Thus, the analysis of the claims for declaratory relief require the

27   Court to determine: (1) whether a partnership existed, (2) if a partnership existed, whether it is

28   void against public policy, (3) whether Roach performed legal work in California, and (4) whether

United States District Court
Northern District of California

the statute of limitations bars Cellars' claim for declaratory relief based on the breach of fiduciary duty (and the defense of unclean hands based on the same conduct). However, because the Court determines, as discussed below, that any partnership would be void due to Roach's legal representation in California, the Court need not determine if a partnership was actually formed.

### 1. Enforcement of Oral Partnership Agreement.

Cellars argues that, even if there were a partnership, Roach cannot enforce it because he violated California Rule of Professional Responsibility Rule 3-300. Cellars argues that California law applies, and because Roach entered into an agreement in which he agreed to provide legal representation to Fred, RBS, and/or Cellars but also entered into a business relationship with them without complying with Rule 3-300, he cannot enforce the terms of the agreement. There are several questions at issue here. First, does California law apply? Second, did Roach agree to provide legal representation to Fred, RBS, and/or Cellars as part of the alleged partnership agreement? Third, did Roach provide legal services in the state of California?

#### i. Application of California Law.

When confronted with a choice-of-law question, a federal district court sitting in diversity must use the choice-of-law rules of its forum state to determine which state's substantive law to apply. *Fields v. Legacy Health Sys*., 413 F.3d 943, 950 (9th Cir. 2005). This Court therefore applies California's choice-of-law rules. California courts apply the "governmental interests" analysis. *In re Yagman*, 796 F.2d 1165, 1170 (9th Cir. 1986), *cert. denied*, 484 U.S. 963 (1987). Under the governmental interest analysis, California will apply its own law unless it is shown that there is a compelling reason to displace another state's law. *Browne v. McDonnell Douglas Corp.*, 504 F. Supp. 514, 517 (N.D. Cal. 1980). The party asserting that another law should apply has the burden of proving that the other state's law applies. *McGhee v. Arabian American Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989).

There is a three-step test to determine whether the other state's law applies. *Rosenthal v. Fonda*, 862 F.2d 1398, 1400 (9th Cir. 1988) (internal citation omitted).

> First, the substantive law of each state must be examined to assure
> that the laws differ as applied to this transaction. Second, if the laws

United States District Court
Northern District of California

> do differ, the court must determine whether a "true conflict" exists
> in that both [states] have an interest in having its law applied.
> Finally, if a true conflict exists, the court must determine which
> state's interest would be more impaired if its policy were
> subordinated to the policy of the other. . . . The conflict is resolved
> by applying the law of the state whose interest would be most
> impaired if its law were not applied.

*Id.* (internal citation omitted)

Here, Roach argues in the affirmative that California law applies to Cellars' claim for breach of fiduciary duty against it but that California law does not apply to the argument that the contract between Roach and Fred is not enforceable. Despite this seeming conflict in position, the Court will analyze the conflict of law independently without regard to this position.

First, the parties agree that Texas law and California law differ on how an oral agreement to enter into a business transaction between an attorney and a client is treated. California had a very clear rule in effect during the relevant time period in its Rules of Professional Responsibility that stated in relevant part:

> Rule 3-300 Avoiding Interests Adverse to a Client
>
> A member shall not enter into a business transaction with a client; or
> knowingly acquire an ownership, possessory, security, or other
> pecuniary interest adverse to a client, unless each of the following
> requirements has been satisfied:
> (A) The transaction or acquisition and its terms are fair and
>     reasonable to the client and are fully disclosed and transmitted
>     in writing to the client in a manner which should reasonably
>     have been understood by the client; and
> (B) The client is advised in writing that the client may seek the
>     advice of an independent lawyer of the client's choice and is
>     given a reasonable opportunity to seek that advice; and
> (C) The client thereafter consents in writing to the terms of the
>     transaction or the terms of the acquisition.

Texas has a different rule:

> (a) A lawyer shall not enter into a business transaction with a client
> unless:
> (1) the transaction and terms on which the lawyer acquires the
> interest are fair and reasonable to the client and are fully disclosed in
> a manner which can be reasonably understood by the client;
> (2) the client is given a reasonable opportunity to seek the advice of
> independent counsel in the transaction; and

*United States District Court*
*Northern District of California*

21

(3) the client consents in writing thereto.

Texas Disciplinary Rules of Professional Conduct, Rule 1.08.

The states also differ in how they enforce these Rules when an agreement is made without following their prescriptions.  In California, while Rule 3-300 does not itself provide a basis for civil liability, California courts have relied on its statutory counterpart, Probate Code § 16004, to create a rebuttable presumption that the transaction is the product of undue influence by the attorney.  An attorney's failure to rebut the presumption renders the transaction voidable at the client's option.  *Ferguson v. Yaspan*, 233 Cal. App. 4th 676, 684-85 (2014).  "An attorney may rebut the presumption of undue influence by showing that 'the dealing was fair and just,' and 'the client was fully advised.'"  *Pizzorno v. Draper*, 2017 WL 4712071, at *6 (C.D. Cal. July 7, 2017) (quoting *BGJ Assocs. v. Wilson*, 113 Cal. App. 4th 1217 (2003)).  In contrast, in Texas "there is no statute or disciplinary rule declaring a contract void or unenforceable because the contract fails to adhere to the requirements of Rule 1.08(a)."  *M.A. Mills, P.C. v. Kotts*, 640 S.W.3d 323, 331 (Tex. App. 2022).  While an attorney's failure to comply with Rule 1.08 may subject that attorney to disciplinary action, "public policy does not demand the invalidation of the parties' oral agreement."  *Id*. at 331-32.

Second, both Texas and California both have interests in overseeing the conduct of lawyers who practice law in their respective states and in protecting their respective citizens.  "California presumably has an interest in the enforcement of oral contracts involving one of its domiciliaries."  *Rosenthal*, 862 F.2d at 1402.  Texas has an interest in regulating the conduct of attorneys admitted to the Texas bar.

Third, and finally, the Court must determine which state's interest would be more impaired.  California has a strong interest in the enforcement of an oral agreement involving one of its citizens.  *Rosenthal*, 862 F.2d at 1402.  In *Rosenthal*, the court found that California did not have a strong interest in applying its policy because the effect would have been "to protect a New York plaintiff that New York ha[d] no interest in protecting."  California's statute was more lenient.  *Id*. at 1403.  In contrast, application here of California's stricter rule would protect California's citizens – Fred, Cellars, and RBS LLC.  However, under the governmental interest

22

analysis, the critical factor is where the relevant events occurred.  *See Grant & Eisenhofer, P.A. v. Brown*, 2018 WL 3817859, at *6 n. 5 (C.D. Cal. Mar. 27, 2018) (distinguishing *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501 (9th Cir. 1993) and *Rosenthal* because in both of those cases the "wealth of transactions and events [ ] occurred in New York").  While Roach argues that he provided legal services only from Texas, the evidence demonstrates otherwise.[5]  Roach defended Fred's deposition in California and for the Mondavi litigation in this District, Roach was admitted *pro hac vice*, represented Cellars at a mediation in California, and negotiated an indemnity agreement with Andy Beckstoffer.  (Dkt. No. 128-20 (Low Decl.), Ex. T; Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9; Dkt. No. 132-1 (MacGregor Decl.), Ex. 49 (Fred Depo.) at 219:12-15; Dkt. No. 164-1 (Suppl. Fred Decl.), ¶¶ 2, 4; Dkt. No. 163 (Roach Response) at page 2; Dkt. No. 164-2 (Suppl. Low Decl.), Ex. B-22.)  Roach also stated that he traveled to Napa, California six to eight times a year for his "wine related legal work."  (Dkt. No. 137-1 (Low Decl.), Ex. R.)

Furthermore, "California has the greater interest in regulating attorneys' representations of California citizens."  *Grant*, 2018 WL 3817859 at *5.  As the California Supreme Court has itself noted when construing Rule 3-300, "there are no transactions respecting which courts . . . are more jealous and particular, than dealings between attorneys and their clients."  *Fletcher v. Davis*, 33 Cal. 4th 61, 67 (2004) (quoting *Eschwig v. State Bar*, 1 Cal.3d 8, 16 (1969)).

Finally, the Court notes that when the parties entered into the purported oral agreement, Rule 1-100 of the California Rules of Professional Conduct was in effect.  This Rule was not in

---

[5] Roach states in his Declaration that he "performed the limited legal work at issue in this case in Texas."  (Dkt. No. 131-1, ¶ 3.)  To the extent this statement can be read as stating that Roach did not perform any legal services while being physically present in California, the Court strikes this statement as a sham declaration.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).  The "sham declaration" rule applies to declarations that contradict not only prior deposition testimony, but also prior sworn interrogatory responses. *School Dist. No. 1 J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993).  Roach testified about representing Cellars at a mediation in the Mondavi litigation and included defending Fred in a deposition in another matter in his interrogatory response.  (Dkt. No. 128-25 (Low Decl.), Ex. Y; Dkt. No. 165-2 (Low Decl.), Ex. D (Roach Depo.) at 190:14-191:11.) Both the mediation and deposition occurred in California.  (Dkt. No. 164-1 (Suppl. Fred Decl.), ¶¶ 2, 4; Dkt. No. 163 (Roach Response) at page 2; Dkt. No. 164-2 (Suppl. Low Decl.), Ex. B-22.)

United States District Court
Northern District of California

effect when *Rosenthal* and *Waggoner* were decided.  When Rule 1-100 was enacted, it stated in full:

> These rules of professional conduct, adopted by the Board of Governors of the State Bar of California, pursuant to the provisions of the State Bar Act, shall become effective upon approval by the Supreme Court of California.  When so approved, these rules shall be binding upon all members of the State Bar, and the willful breach of any of these rules shall be punishable as provided by law. Nothing in these rules is intended to limit or supersede any provision of law relating to the duties and obligations of attorneys or the consequences of a violation thereof.  The prohibition of certain conduct in these rules is not to be interpreted as an approval of conduct not specifically mentioned.  These rules may be cited and referred to as "Rules of Professional Conduct of the State Bar of California."  Wherever in these rules reference is made to a law firm or association, such reference shall also apply to a law corporation.

*See*

https://www.calbar.ca.gov/Portals/0/documents/rules/1975_Rules_of_Professional_Conduct.pdf.

That version of Rule 1-100 that existed from January 1, 1975 to May 26, 1989.

Later, Rule 1-100[6] was amended to define a lawyer as:

> a member of the State Bar of California or a person who is admitted in good standing of and eligible to practice before the bar of any United States court or the highest court of the District of Columbia or any state, territory, or insular possession of the United States, or is licensed to practice law in, or is admitted in good standing and eligible to practice before the bar of the highest court of, a foreign country or any political subdivision thereof.

Rule 1-100 also stated:

> As to lawyers from other jurisdictions who are not members:  These rules shall also govern the activities of lawyers while engaged in the performance of lawyer functions in this state; but nothing contained in these rules shall be deemed to authorize the performance of such functions by such persons in this state except as otherwise permitted by law.

The revision to Rule 1-100 thus distinguishes *Rosenthal* and *Waggoner* from this case.  Here,

---

[6] This version was in effect from 1992 to 2018.  See
https://www.calbar.ca.gov/Portals/0/documents/rules/1975_Rules_of_Professional_Conduct.pdf.

United States District Court
Northern District of California

California has made clear that it has a stronger interest in regulating the conduct of lawyers who engage in business transactions with their clients, and California specifically chose to regulate out of state lawyers who provide legal services in this state.  Texas might have an interest in regulating its lawyers, but California's law is more impaired if it is not able to regulate the conduct of lawyers from other states who provide legal advice in California.

For these reasons, California law applies to this situation.

### ii.      Roach's Representation of Fred, Cellars and RBS LLC.

Roach argues that, even if California law applies, he only provided "sporadic and limited 'high-level' business advice to Fred, even in matters that nominally involved [ ] Cellars[]" and that he "did not represent Fred or [ ] Cellars when they entered into their agreement for the RBS Venture in 2001." (Dkt. No. 132 at page 10.)  However, the evidence in the record, including Roach's own testimony and statements, demonstrates otherwise.  Moreover, the relevant time period to determine whether Roach provided legal services is broader than 2001, when the purported oral agreement was created.  First, as Roach testified, the agreement changed several times, including one amendment as late as 2010, when Cellars increased the cases of wine it was sending Roach from 15 to 17 to compensate him for the deficiency in his six percent interest. (Dkt. No. 128-1 (Low Decl.), Ex. A (Roach Depo.) at 103:9-104:12; Dkt. No. 128-2 (Low Decl.), Ex. B (Roach Depo.) at 30:3-10; Dkt. No. 131-1 (Roach Decl.), ¶ 19.)  The agreement also changed when Brown withdrew from the partnership, when the RBS wine was placed under Cellars' label, and when it was determined that the profit would be put back into RBS.  (Dkt. No. 128-2 (Low Decl.), Ex. B (Roach Depo.) at 30:11-20.)  Roach fails to address the status of his legal representation at each of these relevant times.  *See Fergus v. Songer*, 150 Cal. App. 4th 552, 560, 570 (2007) (finding both original and amended agreements were unenforceable for failing to comply with Rule 3-300).

There is ample evidence in the record, including Roach's own statements, showing that Roach represented Fred before they entered into the alleged partnership agreement in 2001 and that Roach represented Fred, Cellars and RBS from the start of the purported agreement through mid-2016.  In the 1997-1998 timeframe, Roach provided legal advice to Fred personally in

connection with Fred's divorce from his then-wife Ann Colgin.  (Dkt. No. 128-25 (Low Decl.), Ex. Y (Response to Interrogatory No. 9); Dkt. No. 131-1 (Roach Decl.), ¶ 5); *see also* Dkt. No. 165-2 (Roach Depo.), Ex. C. at 141:2-10 (testifying that he and Fred had a preexisting legal relationship when they entered into the purported agreement).)  In January 2003, Roach applied to practice *pro hac vice* in this Court as counsel of record for Cellars in the Mondavi litigation, which was granted in July of that year.  In that litigation, Roach represented Cellars at a mediation and negotiated an indemnity agreement on behalf of Fred and Cellars.  (Dkt. No. 128-20 (Low Decl.), Ex. T; Dkt. No. 128-25 (Low Decl.), Ex. Y; Dkt. No. 132-1 (MacGregor Decl.), Ex. 49 (Fred Depo.) at 219:12-15.)  Also in 2003, Roach provided legal advice to Fred in litigation with Margaux Singleton.  (Dkt. No. 128-25 (Low Decl.), Ex. Y.)  In late 2003/early 2004, Roach defended Fred's deposition.  (*Id*.)  In 2005/2006, Roach represented Fred in locating appellate counsel in California for litigation related to another partnership.  (*Id*.)  In response to an inquiry by the Internal Revenue Service regarding Roach's documentation for his expense deductions for RBS in 2008, Roach stated in an email to his accountant that Roach listed himself as outside general counsel regarding legal issues, trademark infringement actions, and suits to stop logging on vineyard property owned by Cellars.  (Dkt. No. 165-2 (Low Decl.), Ex. D (Roach Depo.) at 123:16-124:23.)  In 2009, Roach represented Cellars in a trademark dispute with Schrader Vineyards.  (Dkt. No. 128-25 (Low Decl.), Ex. Y.)  In 2010, Roach assisted Fred in the dissolution of Bob Coakley's ownership in Boar's View.  (*Id*.)  In 2012, Roach "assisted Fred in a dispute over a large purchase of Schrader wine by a major collector.  (*Id*.)

Roach also repeatedly stated that he represented Fred, RBS, and Cellars over a long period of time.  Roach agreed that "from the inception of Roach Brown Schrader, LLC through mid-2016, [he] provided substantial and valuable legal services and gave business advice to [ ] Cellars and Roach Brown Schrader, LLC[.]"  (Dkt. No. 165-2 (Low Decl.), Ex. D (Roach Depo.) at 119:2-121:3; Dkt. No. 128-14 (Low Decl.), Ex. N (Fifth Amended Petition) at ¶ 14 (same); *see also* Dkt. No. 137-1 (Low Decl.), Ex. B (Roach Depo.) at 125:1-25 (testifying that he provided discrete and legal services regarding trademark infringement and a logging suit that were akin to an outside general counsel responsibilities); (Dkt. No. 137-1 (Low Decl.), Ex. R ("Subsequent to

forming the RBS partnership, I have served as the outside general counsel to [ ] Cellars."); Dkt. No. 165-2 (Low Decl.), Ex. D (Roach Depo.) at 123:16-124:23 (testifying that Roach told his accountant he was outside general counsel for RBS regarding legal issues, trademark infringement actions, and suits to stop logging on vineyard property owned by Cellars); Dkt. No. 54 (Counterclaim), ¶ 15 ("For nearly two decades, [ ] Cellars and Fred [ ] also requested and procured free marketing work, legal work . . ."); Dkt. No. 132-1 (MacGregor Decl.), Ex. 31 (First Amended Petition) at ¶ 14 (alleging Roach "regularly gave business and legal advice to [Fred] and [ ] Cellars".), Ex. 34 (Second Amended Petition) at ¶ 14 (same), Ex. 35 (Third Amended Petition) at ¶ 14 (same).)

And according to Roach, the oral agreement itself included Roach's obligation to provide legal services.  (Dkt. No. 132-1 (MacGregor Decl.), Ex. 51 (Roach Depo.) at 25:25-27:11; Dkt. No. 137-1 (Low Decl.), Ex. A (Roach Depo.) at 9:6-15; Dkt. No. 165-2 (Low Decl.), Ex. D (Roach Depo.) at 119:2-121:3; Dkt. No. 54 (Counterclaim), ¶ 15 (alleging Fred and Cellars procured free legal work from him by representing to Roach that he had an equity ownership interest in RBS), ¶ 27; Dkt. No. 132-1 (MacGregor Decl.), Ex. 31 (First Amended Petition) at ¶ 14, Ex. 34 (Second Amended Petition) at ¶ 14, Ex. 35 (Third Amended Petition) at ¶ 14.)  The California Supreme Court has made clear that Rule 3-300 applies to retainer agreements to begin providing legal services where the agreement includes a business component, such as a charging lien (a lien upon a prospective fund or judgment recovered to compensate the attorney).  *See Fletcher v. Davis*, 33 Cal. 4th 61, 69 (2004).  The Court relied in part on the discussion note following Rule 3-300, "which states that '[r]ule 3-300 is intended to apply where the member wishes to obtain an interest in client's property in order to secure the amount of the member's past due or future fees.'"  *Id*. at 70 (quoting Rules Prof. Conduct, foll. Rule 3-300, p. 366).  Under *Fletcher*, the Ninth Circuit has invalidated liens in retainer agreements which fail to comply with Rule 3-300.  *See In re Shaver Lakewoods Dev. Inc.*, 2016 WL 7188660, at *5 (B.A.P. 9th Cir. Nov. 29, 2016) ("It is well-established that an attorney who secures payment of fees by taking a lien on the property of a client creates an 'adverse interest' and must comply with the ethical obligations in Rule 3-300."); *In re Segovia*, 346 F. App'x 156, 158 (9th Cir. 2009) (fee agreement

1    in violation of Rule 3-300 was unenforceable); *In re Segovia*, 2008 WL 8462967, at *9 (B.A.P.

2    9th Cir. Oct. 22, 2008) (same).

3          Therefore, the Court finds that Roach represented Fred, Cellars, and RBS LLC as he

4    entered into a business relationship with a client (Fred, Cellars, and RBS LLC).

5                    **iii.    Roach's Work in California.**

6          Roach also argues that he never practiced law "in this state," and Rule 1-100 by its terms

7    applies California's Rules of Professional Conduct to lawyers who practice "in this state."  Rule 1-

8    100 is silent as to the definition of the term "in this state."  But the California Supreme Court

9    discussed what practice in the state of California means in the context of the unlicensed practice of

10   law in California.  *Birbower, Montalbano, Condon & Frank, P.C. V. Superior Court (ESQ*

11   *Business Services, Inc.)*, 17 Cal. 4th 119 (1998).  In *Birbower*, the California Supreme Court found

12   that New York lawyers violated Business and Profession Code § 6125 that states that only active

13   members of the California state bar can practice law "in California."  *Id*. at 140.  In *Birbower*, a

14   New York law firm provided advice to a California corporation and visited California to give legal

15   advice in three trips.  *Id*. at 125.  The California Supreme Court found that the activity was

16   sufficient to constitute the practice of law in California and that the New York law firm could not

17   collect fees for work performed in California.  *Id*. at 140.  In reaching that conclusion, the

18   California Supreme Court wrote:

19                 Our definition does not necessarily depend on or require the
20                 unlicensed lawyer's physical presence in the state.  Physical
                   presence here is one factor we may consider in deciding whether the
21                 unlicensed lawyer has violated section 6125, but it is by no means
                   exclusive.  For example, one may practice law in the state in
22                 violation of section 6125 although not physically present here by
                   advising a California client on California law in connection with a
23                 California legal dispute by telephone, fax, computer, or other
                   modern technological means.  Conversely, although we decline to
24                 provide a comprehensive list of what activities constitute sufficient
                   contact with the state, we do reject the notion that a person
25                 *automatically* practices law "in California" whenever that person
                   practices California law anywhere, or "virtually" enters the state by
26                 telephone, fax, e-mail, or satellite. . . .We must decide each case on
27                 its individual facts.

28

United States District Court
Northern District of California

*Id*. at. 128-129 (internal citations omitted).  The California Supreme Court stated that in addition to a "quantitative analysis," the "nature of the unlicensed lawyers' activities in the state" were a consideration.  *Id*. at 128.  "The primary inquiry is whether the unlicensed lawyer engaged in sufficient activities in the state, or created a continuing relationship with the California client that included legal duties and obligations." *Id*. at 128.  Here, Roach was representing California clients in disputes in California.  Therefore, regardless of Roach's physical location, he performed legal services in California.

Roach contends that he performed all of the work for Fred, Cellars or RBS in Texas.  (Dkt. No. 165-2 (Low Decl.), Ex. C (Roach Depo.) at 18: 19-24 ("The work that we did -- the research that we did, the analysis that we did . . . was all done in Texas.").[7]  However, he ignores the occasions where he was physically present in California to defend Fred in his deposition in the Turley litigation and to participate in the mediation on behalf of Cellars.  He also ignores that he filed an application, which the Court granted, to appear *pro hac vice* on behalf of Cellars in the Mondavi litigation.  While Roach attempts to limit this representation to Fred personally, Fred was not a party in that litigation.  Regardless, even if he was merely representing Fred, Roach's theory is that his oral agreement with *Fred* generated his ownership interest in RBS wine and that *Fred's* comingling of RBS assets into Cellars and *Fred's* wrongful sale of RBS assets to Constellation along with Cellars caused Roach's injuries.  Also, Roach ignores his own deposition testimony in which he says that his work was "akin" to being general counsel, and he ignores his own email in which he claimed that he was "outside general counsel" to Cellars and that his "wine related legal work" took him "to Napa 6 to 8 times a year."  (Dkt. No. 137-1 (Low Decl.), Ex. R.)  Roach's representation of Fred, Cellars, and RBS was as extensive or more extensive than the work performed by the New York lawyers in the *Birbower* case, where they made only three physical trips to California to represent a California client but performed the bulk of their work in New York.  *Birbower*, 17 Cal. 4th at 125.  Roach's representation of Fred, Cellars and RBS was for

---

[7] As noted above, Roach states in his Declaration that he "performed the limited legal work at issue in this case in Texas."  (Dkt. No. 131-1, ¶ 3.)  However, the Court struck this as a sham declaration to the extent this statement can be read as stating that Roach did not perform any legal services while being physically present in California.

United States District Court
Northern District of California

1    actions in California as part of his continuing relationship with Fred, RBS, and Cellars.  Thus,

2    Roach was engaged as a lawyer in this state.

3                          **iv.     Effect of Violation of 3-300.**

4            There is no dispute that Roach did not comply with Rule 3-300, which requires a writing,

5    because the parties agree that there was no writing to memorialize this agreement.  As discussed

6    above, an attorney's failure to rebut the presumption that a transaction made in violation of Rule

7    3-300 is the product of undue influence renders the transaction voidable at the client's option.

8    *Ferguson*, 233 Cal. App. 4th at 684-85; *see also Sheppard, Mullin, Richter & Hampton, LLP v. J-*

9    *M Mfg. Co.*, 6 Cal. 5th 59, 73-74 (2018) ("California courts have held that a contract or transaction

10   involving attorneys may be declared unenforceable for violation of the Rules of Professional

11   Conduct . . . ." noting "[i]t would be 'absurd,' . . . for a court to aid an attorney in enforcing a

12   transaction prohibited by the rules.").  "An attorney may rebut the presumption of undue influence

13   by showing that 'the dealing was fair and just,' and 'the client was fully advised.'"  *Pizzorno*,

14   2017 WL 4712071, at *6 (quoting *BGJ*, 113 Cal. App. 4th 1217).  Here, Roach has made no such

15   effort to rebut this presumption.  Accordingly, the purported oral agreement in which Roach

16   allegedly obtained a partnership interest in RBS LLC was made in violation of Rule 3-300 is not

17   enforceable.

18           Given that the alleged partnership agreement is not enforceable, Cellars prevails on its

19   claim for declaratory relief, and Roach cannot prevail on his claims for declaratory relief and

20   equitable accounting, as they are all based on the existence of an enforceable partnership

21   agreement.

22           Neither party provided any briefing with regard to the effect of a finding that there is no

23   partnership agreement on Roach's first and second counterclaims for cancellation of the RBS

24   trademark.  For that reason, the Court will seek additional briefing from the parties, as noted

25   below.

26           **2.     Does the Statute of Limitations Bar Cellars' Claims and Defense of Unclean
                      Hands?**

27
28   Roach argues that California law applies in providing a statute of limitations for Cellars'

United States District Court
Northern District of California

30

claims for breach of fiduciary duty and defense of unclean hands.  Given the analysis above, the

Court finds that California law applies to Cellars' claims for breach of fiduciary duty and defense

of unclean hands.[8]  California provides a statute of limitations for claims against attorneys in some

situations:

> An action against an attorney for a wrongful act or omission, other
> than for actual fraud, arising in the performance of professional
> services shall be commenced within one year after the plaintiff
> discovers, or through the use of reasonable diligence should have
> discovered, the facts constituting the wrongful act or omission, or
> four years from the date of the wrongful act or omission, whichever
> occurs first.

Cal. Code Civ. Proc. §340.6.  The statute is tolled if the "plaintiff has not sustained actual injury."

Cal. Code Civ. Proc. §340.6(1).  A client suffers damages "when he is compelled, as a result of the

attorney's error, to incur or pay attorney fees."  *Jordache Enterprises, Inc. v. Brobeck, Phleger, &*

*Harrison*, 18 Cal.4th 739, 750-751 (1998).  The threat of a future suit is not an actual injury.  *Id*. at

1076 (internal citations omitted).

Roach argues that the statute of limitations accrued on May 16, 2019, when Constellation,

the owner of Cellars, sought and obtained indemnity from Fred in the Texas litigation.  (Dkt. No.

130-3 at page 21.)  Thus, Roach argues that the statute of limitations expired on May 16, 2020,

well before Cellars filed this suit for breach of fiduciary duty in February 2021 (and later defense

of unclean hands to Roach's counterclaims).  Cellars argues that the statute of limitations started

to accrue on January 11, 2021, when Roach filed his Fifth Amended Petition seeking dissolution

of Cellars.  The parties disagree about whether Cellars discovered or should have discovered the

alleged breach of fiduciary duty before 2021.

Cellars argues that, even if the statute of limitations accrued before 2021, it was tolled until

March 2021, when Cellars first received an invoice for legal fees for the Texas litigation.  Cellars

alleges that, when Roach filed the Fifth Amended Petition in which he sought dissolution of

---

[8] At the hearing, for the first time, Roach argued that the statute of limitations also bars
Cellars' claim for declaratory relief, but Roach did not raise this in his opening brief and did not
provide authority for this position.  Roach did not move for summary adjudication on this issue,
and he provided no briefing to support his argument.

Cellars, that filing caused Cellars to incur legal fees for that matter. "At that time [of the Fifth Amended Petition], [ ] Cellars engaged counsel to review materials Roach produced in the Texas case to determine how to remove any future threat to its equity." (Dkt. No. 137-1 (Low Decl.), ¶¶ 6, 8.) Cellars presents evidence that it first received invoices for legal fees in March 2021 for the representation of Cellars in the Texas litigation. (*Id.*; Dkt. No. 137-2 (Smith Decl.), ¶ 3.) Cellars did not incur any legal fees for either the Texas litigation or this suit before the March 2021 invoice date. (Dkt. No. 137-2 (Smith Decl.), ¶ 3.) Roach argues that the deposition testimony of Cellars' witness pursuant to Fed. R. Civ. P. 30(b)(6) contradicts that self-serving declaration. In that deposition, though, the question was when Cellars was first damaged by Roach's alleged breach of fiduciary duty, and the deponent said that the damages were the legal fees from this California case and the Texas case. (Dkt. No. 132-1 (MacGregor Decl.), Ex. 48 (Smith Depo.) at 257: 4-19.) However, the deponent did not say *when* the fees were incurred by *Cellars* in the Texas case. The Low and Smith Declarations are not inconsistent with the testimony of the Rule 30(b)(6) deponent. Low and Smith pinpoint the date that *Cellars* first incurred legal fees in the Texas litigation to the time the Fifth Amended Petition was filed. It is clear that Constellation and Fred incurred attorneys' fees in the Texas litigation, because they were named as defendants, before March 2021, but the question that was not asked and not answered in the deposition was when *Cellars*, as opposed to Fred and Constellation, first incurred legal fees in the Texas litigation.

Roach seems to argue that, as soon as Constellation incurred fees in the Texas litigation, Cellars did. However, the two entities are separate and distinct, as Constellation is the parent company of Cellars. (Dkt. No. 129 (Smith Decl.), ¶ 1.) Parents and subsidiaries are recognized as separate entities under the law. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474, (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities.") Roach cannot impute legal fees incurred by Constellation to Cellars.

Thus, the statute of limitations does not bar Cellars' claims for breach of fiduciary duty or defense of unclean hands, and, even if applicable to Cellars' claim for declaratory relief, does not bar that claim either.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Cellar's motion for partial summary adjudication on its claim for declaratory relief and on all of Roach's remaining counterclaims except Counterclaims 1 and 2, for which the Court RESERVES ruling. The Court DENIES Roach's motion for summary adjudication on the issues of statute of limitations and whether Roach violated California Rule of Professional Responsibility Rule 3-300.

The Court DIRECTS the parties to meet and confer and file a status update by no later than January 3, 2023, to inform the Court as to what portions of this case, if any, remain in light of the Court's ruling and to discuss a briefing schedule for the issue of Roach's first and second counterclaims. Furthermore, by January 3, 2023, Cellars shall inform the Court whether it intends to proceed with its two motions to exclude expert testimony (Dkt. Nos. 151, 160) or whether it withdraws those motions as moot.

**IT IS SO ORDERED**.

Dated: December 16, 2022

SALLIE KIM
United States Magistrate Judge